**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

DEBORAH BAUER-ROBERTSON, et al, *on
behalf of themselves and all others similarly
situated,*

           Plaintiffs,

v.                                    Civil Action No. 3:20-cv-00551

SHIVA FINANCE, LLC, et al.

           Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS**

       COME NOW, the Plaintiffs, on behalf of themselves and all others similarly situated, by

counsel, and for their Response to Defendants' Motion to Compel Arbitration and Dismiss, (ECF

No. 10,), they submit the following. Plaintiffs have noticed their voluntary dismissal of their claims

against Harpeth without prejudice and are thus not responding to the motion to dismisss that claim.

**INTRODUCTION**

       Defendant Shiva Finance, LLC ("Defendant" or "Advance Financial") operates as Internet

lender Advance Financial to aggressively market loans to Virginia consumers at interest rates

above 300% APR, in violation of state law. Although the loans are illegal, it thought it could get

away with profiting from such illegal conduct. The trick was to add a forced arbitration clause that

would shield Defendant from consumer lawsuits, particularly class action lawsuits. To make it

appear reasonable, Defendant added a provision some institutional arbitration companies require

as a condition of allowing a business to use its arbitrators: the consumer has to be able to litigate

in "Small Claims Court."

But this presented Defendant with a problem – if the arbitration clause was to be mutual, and use of standard collection lawsuits was unavailable, how could it make sure its consumer targets paid these ridiculous 360% interest loans? Private arbitration is expensive and unpredictable, costing much more than the loan balances themselves. It takes a long time compared to collection lawsuits, most of which harvest default judgments on the first return date. And because the arbitration is secret, it does not create a credit reporting record or allow quick garnishments necessary to pressure payment like a civil judgment would. Defendant's solution was simple: tell consumers they were forbidden from going to court, promise them that Defendant was as well, and then ignore that restriction hoping *pro se* consumers would be powerless to know or do anything to prevent such misconduct.

Since it began using this sham provision, purportedly barring litigation by both sides, Defendant has filed thousands of collection lawsuits. In just the last 3 years, through counsel, it has sued roughly 2,000 Virginia consumers.[1] And of course – because lawyers cannot litigate in Small Claims Court – all were brought in General District Court.

This action in significant part alleges that Defendant's promise to be bound by the "no litigation" term was fraudulently made because before, during, and after using this clause, Defendant was ignoring same. Advance Financial never intended to perform on the promise of waiving its right to sue in court. And now, after suing many of the Plaintiffs and the Class, in clear contravention of the arbitration term, Defendant wants to again raise this fraudulent shield to prevent class members from doing to it what it has already done to many of them.

---

[1] Exhibit A is the Consent Decree Advance Financial entered with the Virginia Attorney General in the latter's own prosecution of state claims for the same misconduct. (Ex. A, Virginia Attorney General Enforcement Action.) Plaintiffs request the Court take judicial notice under Fed. R. Evid. 201(b)(2) of this lawsuit as it is public record and can be obtained from the Richmond Circuit Court. Between October 2017 and February 2020, 1,971 such actions were filed. (*Id*. at 3.)

## FACTS AND PROCEDURAL HISTORY

Defendant operates as an Internet lender that sells credit to Virginia consumers with a usurious APR of well over 300%. (*See e.g.* Compl. ¶¶ 33, 36, 44, 49, ECF No. 1; Defs.' Mem. Supp. Mot. Compel Arbitration & Dismiss Ex. A, at 2, ECF No. 11-1.)

In each of its credit agreements, Defendant required consumers to enter what Defendant represented to be a mutual binding arbitration clause. (Defs.' Mem. 2, ECF No. 11.) On its face, this arbitration clause appeared to require both Defendant and consumers to forgo conventional litigation and use only arbitration to resolve all disputes. (*Id.* at 3.) It specifically states that the parties are waiving the right to go to court. Ignoring this agreement to arbitrate, Defendant repeatedly sued borrowers in General District Court. (Compl. ¶¶ 45, 66, 73, 82, 87, 92, 97, 116; Defs.' Mem. Exs. C–J, ECF Nos. 11-3–11-10.)

A narrow exception was included in the arbitration to allow the parties to file in and use "small claims court." (Defs.' Mem. Ex. A at 5.) This provision was not included out of the goodness of Defendant's corporate heart. It was added because both of the two national arbitration organizations – the American Arbitration Association ("AAA") and JAMS – require it. Otherwise, Defendant's forced arbitration demands would be rejected. Both of these organizations have a set of standards that must be required if the organization will even allow its use in forced arbitration. (Ex. B, JAMS Consumer Minimum Standards; Ex. C, AAA Consumer Due Process Protocol.)[2] AAA further requires that claims between a business and a consumer follow separate "Consumer

---

[2] Plaintiffs request the Court take judicial notice under Fed. R. Evid. 201(b)(2) of both of these documents as each is publicly available online through the respective arbitration forum's website. *Consumer Arbitration Minimum Standards*, JAMS (July 15, 2009), https://www.jamsadr.com/consumer-minimum-standards/; *Consumer Due Process Protocol Statement of Principles*, American Arbitration Association, https://www.adr.org/sites/default/files/document_repository/Consumer%20Due%20Process%20 Protocol%20(1).pdf (last visited Nov. 25, 2020).

Rules" and JAMS also provides a streamlined set of rules for claims under a certain amount. (Ex. D, AAA Consumer Arbitration Rules; Ex. E, JAMS Streamlined Arbitration Rules.)[3] The JAMS Consumer Minimum Standards provide that "JAMS will administer arbitrations pursuant to mandatory pre-dispute arbitration clauses between companies and consumers only if the contract arbitration clause and specified applicable rules comply with the following minimum standards of fairness." (Ex. B, JAMS Consumer Minimum Standards, at 3.) AAA goes even further and provides that,

> Beginning September 1, 2014, a business that provides for or intends to provide for these Rules or another set of AAA Rules in a consumer contract should
>
> 1. notify the AAA of the existence of such a consumer contract or of its intention to do so at least 30 days before the planned effective date of the contract.
>
> 2. provide the AAA a copy of the arbitration agreement.
>
> Upon receiving the arbitration agreement, the AAA will review the agreement for material compliance with due process standards contained in the Consumer Due Process Protocol and the Consumer Arbitration Rules.

(Ex. D, AAA Consumer Arbitration Rules, R-12.)

Both JAMS and AAA require (amongst other protections) two things: First, the consumer must be permitted to pursue his claim in "small claims court." JAMS requires that "no party shall be precluded from seeking remedies in small claims court for disputes or claims within the scope of its jurisdiction." (Ex. B, JAMS Minimum Standards, at 3.) AAA includes this requirement as a formal Rule. (Ex. D, AAA Consumer Arbitration Rules, at R-9.)

---

[3] Plaintiffs request the Court take judicial notice under Fed. R. Evid. 201(b)(2) of both of these sets of rules as each is publicly available online through the respective arbitration forum's website. *Consumer Arbitration Rules*, American Arbitration Association, https://adr.org/sites/default/files/Consumer%20Rules.pdf (last visited Nov. 25, 2020); *Streamlined Arbitration Rules & Procedures*, JAMS, https://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/JAMS_streamlined_arbitration_rules-2014.pdf (last visited Nov. 25, 2020).

Second, the arbitration restrictions must be *mutual.* If Defendant submitted an arbitration clause that did not appear to require the same restrictions for both the consumer and the Defendant, it would be rejected. For example, JAMS expressly requires, "The arbitration agreement must be reciprocally binding on all parties such that . . . if a consumer is required to arbitrate his or her claims or all claims of a certain type, the company is so bound[.]" (Ex. B, JAMS Minimum Standards, at 3.)

Accordingly, had Defendant not allowed for the small claims court option and not made the "no lawsuits" term reciprocal, neither of the two main arbitration organizations would have accepted consumer arbitrations and Defendant would end up back in court.

Virginia Small Claims Court was created by Virginia's legislature as distinct from General District Court, though it shares some jurisdiction. VA. CODE ANN. § 16.1-122.2 ("Notwithstanding any provision of law to the contrary, the small claims court shall have jurisdiction, concurrent with that of the general district court, over the civil action specified in § 16.1-77 (1) when the amount claimed does not exceed $5,000, exclusive of interest."); *see also* VA. CODE ANN. § 16.1-122.4 ("A defendant shall have the right to remove the case to the general district court at any point preceding the handing down of the decision by the judge and may be represented by an attorney for that purpose.")

Small Claims Court is very different from any other, including General District Court. The small claims plaintiff initiates such a claim using a unique "small claims civil warrant." VA. CODE. ANN. § 16.1-122.3. Importantly, no attorneys are allowed. VA. CODE ANN. § 16.1-122.4 ("All parties shall be represented by themselves in actions before the small claims court" and "[a]n attorney . . . may not serve in a representative capacity."). In contrast to any other court, a consumer who "is unable to understand or participate on his own behalf in the hearing may be represented

by a friend or relative if the representative is familiar with the facts of the case and is *not an attorney*." *Id.* (emphasis added). And of course, the maximum exposure a consumer could face in Small Claims Court – inclusive of any attorneys' fees (which would have to be none) is $5,000. VA. CODE ANN. § 16.1-122.2.

In January 2020, Defendant emailed a notice to borrowers, attempting to unilaterally change the arbitration clause to permit Defendant to sue borrowers in Virginia General District Courts. (Defs.' Mem. 3; Ex. F, Advance Financial Notice Regarding Arbitration Terms.)[4] Defendant has then continued to sue consumers in Virginia General District Court despite the fact that these consumers had entered in credit contracts with Defendant that included the arbitration clause that prohibited such lawsuits. (Compl. ¶¶ 43, 45, 76, 82; Defs.' Mem. Exs. C, F.). In each instance, Defendant used an attorney. (*See eg.* Defs.' Mem. Ex. C, at 2, Ex. D, at 2, Ex. E, at 2, Ex. F, at 2, Ex. G, at 2, Ex. H, at 2, Ex. I, at 2, Ex. J, at 2; Ex. G, Shoenfeld Declaration and Table of Lawsuits Filed by Advance Financial.) A number of the consumer debt collection lawsuits Defendant brought against putative class members were for amounts greater than $5,000. (Ex. H, Reformatted and Filtered Advance Financial Court Data, at 1-5.)[5]

While Defendant has been sued for these claims in earlier private litigation,[6] in 2020 the Virginia Attorney General began investigating Defendant's arbitration clause fraud. A settlement

---

[4] Plaintiffs request the Court to consider these emails as party admissions as they were statements made by Advance Financial. Fed. R. Evid. 801(d)(2).

[5] Exhibit H is a demonstrative exhibit that was created from the data in Exhibit G and then filtered to only to warrant in debts in which Advance Financial obtained a judgment and Principal Amount was not set to NULL, and then sorted on the Principal Amount column, from highest amount to lowest amount. For ease of reading, the Judgment column was relabeled to Judgment from Defendant Information and the Judgment-2 column was relabeled to Judgment from Judgment Information. Columns to the right of the InterestAward column have been removed.

[6] *See e.g.* Complaint, *Blackburn v. Shiva Finance, LLC,* No. 3:19-cv-0017-HEH (E.D. Va. Feb. 21, 2019), ECF No. 1.

"Assurance of Voluntary Compliance" was executed by Defendant on September 20, 2020. (Ex. A, Virginia AG Enforcement Action, at 25–43.) In same, it was disclosed that just between October 2017 and February 1, 2020, Defendant had filed over 1,900 debt collection lawsuits in Virginia General District Courts. (*Id.* at 27.) Defendant was represented by counsel in each of these lawsuits. (*Id.*) And it took judgment in over 1,500 of these General District Court cases, and collected money in nearly 530 of them. (*Id.*)

The Attorney General alleged in the settlement to which Defendant agreed, "Advance Financial misrepresented to consumers in its Contract that all disputes would be heard in either arbitration or in small-claims court, and instead it hired counsel and filed 1,971 lawsuits in general district courts all over the Commonwealth." (*Id.* at 28.)

Plaintiffs here allege that Defendant never intended to refrain from collecting against them in General District Court. (Compl. ¶¶ 7–8, 41–42, 141, 154–55, 169–72, 188–91.) Instead, Defendant used the faux arbitration clause to deter consumers such as the Plaintiffs from bringing their own actions, while continuing to use the regular court process to collect allegedly defaulted debts. (*Id.*).

## ARGUMENT

### I.    THE COURT DETERMINES WHETHER A VALID AND ENFORCEABLE ARBITRATION CONTRACT EXISTS.

Because the delegation clause in the arbitration clause is unconscionable and unenforceable for the same reasons as the rest of the clause, the Court is the ultimate authority on whether arbitration should be required.

The legal standard that applies to the Court's determination of whether arbitration may be judicially compelled is similar to that applied at summary judgment. *Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC*, No. 1:17-CV-186, 2017 WL 1491134, at *6 (E.D. Va. Apr. 25, 2017).

Accordingly, "the pleadings and 'all relevant, admissible evidence submitted by the parties' are considered and all 'reasonable inferences' are drawn in favor of the non-moving party." *Id.* (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). When facts pertinent to the arbitration motion are in dispute, then an evidentiary process is to be conducted. 9 U.S.C. § 4; *see Yancey v. Equifax Info. Servs., LLC,* No. 3:18cv739 (DJN), 2019 WL 4257201, at *1–*3 (E.D. Va. June 12, 2019) (ruling that whether party actually entered into arbitration agreement to be an issue for judicial determination and ordering evidentiary hearing on the matter); *see also Gordon v. TBC Retail Grp., Inc.*, No. 2:14-cv-03365-DCN, 2016 WL 4247738, at *11 (D.S.C. Aug. 11, 2016) (granting plaintiffs' request for an evidentiary hearing concerning factual disputes about how parties purportedly agreed to arbitration). The Federal Arbitration Act ("FAA") is the starting point for the analysis of whether the arbitration clause in issue is an enforceable waiver of the right to trial, and it instructs that this Court should determine whether an arbitration agreement is valid. In analogous litigation against a comparable Internet lender, the Fourth Circuit unambiguously held:

> The FAA confers near plenary authority on an arbitrator to resolve a dispute given to him by an arbitration agreement. For this authority to be validly exercised, however, any agreement purporting to give a dispute over to arbitration must itself be valid. **The validity of an arbitration agreement is a "question of arbitrability" and, in the normal course, it "is undeniably an issue for judicial determination**."

*Hayes v. Delbert Servs. Corp.*, 811 F.3d. 666, 671 (4th Cir. 2016) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*., 475 U.S. 643, 649 (1986)) (emphasis added); *see also Peabody Holding Co. v. United Mine Workers of Am., Int'l Union,* 665 F.3d 96, 102 (4th Cir. 2012).

Pursuant to the FAA, when the making of an agreement to arbitrate is disputed, the Court should proceed "summarily" to resolve the issue. 9 U.S.C. § 4. When a party asserts that a matter is covered by a binding arbitration agreement, the Court is to "hear the parties, and upon being

satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue[,]" shall order arbitration. *Id.* "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, . . . the court shall hear and determine such issue." *Id.*; *see Yancey,* 2019 WL 4257201, at \*3; *Gordon,* 2016 WL 4247738, at \*11. Consequently, **this Court** is to summarily decide whether an arbitration agreement was ever made.

When a party opposes an arbitration agreement with a delegation clause that provides that the validity of the clause is to be determined by the arbitrator, that party must first object to the delegation clause. *Gibbs v. Sequoia Cap. Operations*, 966 F.3d 286, 291 (4th Cir. 2020) (relying on *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). After a party has "challenged the enforceability of the delegation provision, we then must decide whether the delegation provision is unenforceable 'upon such grounds as exist at law or in equity.'" *Id.* (citing *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc*., 867 F.3d 449, 453 (4th Cir. 2017) (quoting 9 U.S.C. § 2)). Asserting that objection in opposition to the motion to compel arbitration "is all that is required to mount a challenge to the delegation clause." *Id.*

The Fourth Circuit has made clear that when "challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *Id.* (citing *MacDonald v. CashCall, Inc*., 883 F.3d 220, 226–27 (3d Cir. 2018)). A party seeking arbitration cannot claim that all issues about an arbitration clause must be decided by an arbitrator simply because a delegation clause is included, rather the Court in the first instance must determine whether a valid arbitration clause exists. *Id.* at 292, n.3 (explaining that *Henry Schein, Inc. v. Archer & White Sales, Inc.*, —— U.S. ——, 139 S. Ct. 524, 530 (2019), noted,

"before referring a dispute to an arbitrator, the court must determine [under 9 U.S.C. § 2] whether a valid arbitration agreement exists."). As this Court has noted in another Internet lending case, an "agreement to delegate gateway issues to an arbitrator must survive § 2 of the FAA, which subjects such agreements to legal and equitable defenses." *Hengle v. Asner*, 433 F. Supp. 3d 825, 846 (E.D. Va. 2020), *motion to certify appeal granted,* No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020) (citing *Rent-A-Center*, 561 U.S. at 70). Judge Lauck recently summarized the critical distinction, explaining that under a delegation clause, the arbitrator can determine whether or not a particular claim or defense is included within the arbitration agreement, but the Court necessarily determines whether there even is such a valid agreement in the first place:

> In this case, Plaintiffs challenge both the *validity* of the arbitration agreement and the validity of the delegation clause, not the arbitrability or non-arbitrability of issues within the agreement. Indeed, *Schein* directly contravenes Defendants' position when it reaffirms that "[t]o be sure, before referring a dispute to an arbitrator, the court determines whether a *valid arbitration agreement exists*." The Court's task is not to determine whether certain issues are arbitrable, but whether a valid delegation provision exists.

*Gibbs v. Stinson*, 421 F. Supp. 3d 267, 290 (E.D. Va. 2019), *aff'd sub nom. Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286 (4th Cir. 2020).

As set forth in Section II below, three different and independent reasons exist that make the arbitration agreement - and the delegation clause within it - unenforceable. The fraudulent nature of the clause is evident in Defendant's conduct showing that it never intended to forgo its collection lawsuits and instead included the faux clause as a means to deter consumers from doing the same. If the arbitration clause was never valid, the Court never gets to the delegation clause within it. The delegation clause is illusory as Advance Financial has retained the right at any time to simply change the arbitration terms and perhaps decide it does not want an arbitrator to decide the validity of its clause. And even if the delegation clause were somehow not facially invalid,

Defendant through its conduct, has waived any right to enforce the arbitration agreement and that waiver issue is for this Court to decide in the first instance.

Therefore, because Plaintiffs have in this brief attacked the delegation clause for the same reasons that the arbitration agreement as a whole is unenforceable, this Court must necessarily take up those reasons. Plaintiffs were under no obligation to attack the delegation clause in their Complaint and nothing in the Complaint waives their ability to do so now.

## II. THE ARBITRATION CLAUSE IS INVALID AND UNENFORCEABLE.

The arbitration clause, and its delegation clause, is unenforceable for three independent reasons, each of which is sufficient to deny enforcement.

### A. The asserted Arbitration Clause was fraudulently induced, because when it was transacted Advance Financial never intended to honor it as written.

### 1. Unless Defendant is stipulating that it always intended to sue consumers in General District Court, Plaintiffs are properly entitled to discovery and a hearing on this factual issue.

To determine whether an enforceable agreement to arbitrate was ever made, the Court must conduct a factual inquiry. *See Yancey,* 2019 WL 4257201, at *3. The standard to be applied "is akin to the burden on summary judgment." *Chorley Enters. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015). When one party contests the enforceability of an agreement to arbitrate, the Court should hold a hearing to determine the facts.

> The FAA states that, in any suit brought in federal court on any issue referable to arbitration, "upon being satisfied that the issue involved in such a suit ... is referable to arbitration [the court] shall stay the trial." 9 U.S.C. § 3 (emphasis added). The Supreme Court has interpreted this as calling for a hearing with a restricted inquiry into factual issues.

> Where the parties contest the enforceability of an agreement and an evidentiary hearing is necessary to determine whether a contract is valid, as in the present case, the court would be remiss not to hold a hearing. This case has raised a myriad of complex problems that the court has labored to resolve. The Magistrate, recognizing that such a situation was present, was proper and responsible to hold the October 15, 1999 hearing in this case.

*Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F. Supp. 2d 958, 961 (W.D. Va. 2000) (citations omitted); *see also Yancey,* 2019 WL 4257201, at *3. Discovery is proper as to the factual issues related to the enforceability of the arbitration agreement. *Davis v. Lendmark Fin. Servs.*, No. 7:15-cv-000131, 2016 WL 1060340 (W.D. Va. Mar. 11, 2016).

Here, Plaintiffs have presented evidence that Defendant never intended to follow its own arbitration agreement. As set forth below, this fact is fundamental to the fraud issue. On this important factual issue, Defendant can stipulate to this intent or an evidentiary hearing is to be conducted that is preceded by any necessary discovery.

### 2.     The Faux Arbitration Clause was fraudulently induced.

Under the FAA, whether an enforceable agreement to arbitrate is formed is a question of state law. Because the arbitration agreement is within a contract with a choice of law clause that selects the Commonwealth of Virginia's law, (Defs.' Mem. Ex. A., at 4,) this question in this instance looks to Virginia law.

> Under Virginia law, an agreement to arbitrate "must contain the essential elements of a valid contract at common law. It is elementary that mutuality of assent — the meeting of the minds of the parties — is an essential element of all contracts. Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent and, therefore, no contract. A court must ascertain whether a party assented to the terms of a contract from that party's words or acts, not from his or her unexpressed state of mind.

*Davis*, 2016 WL 1060340, at *3 (citations omitted). Similarly, the Virginia Supreme Court has explained that ordinary contract law rules apply to the question of whether an agreement to arbitrate was formed: "[c]onsequently, whether there existed between the parties an enforceable agreement to arbitrate [Plaintiff's] personal injury claim depends on whether the Revised Arbitration Agreement contained the essential elements of a valid contract at common law." *Phillips v. Mazyck*, 273 Va. 630, 635, 643 S.E.2d 172, 175 (2007) (explaining the importance of genuine mutual assent by both parties to form an agreement to arbitrate).

Fraud in the inducement of a contract is common law fraud. *See Abi–Najm v. Concord Condominium*, LLC, 280 Va. 350, 362-63, 699 S.E.2d 483, 489-90 (2010). "[A] false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract." *Id.* (citation omitted). The misrepresentation must be of an existing fact and that fact can include the seller's knowledge that it will not be performing the contract. *Id.* (citations omitted).

In *Prima Paint Corp. v. Flood & Conklin Manufacturing. Corp.*, the Supreme Court explained that when "the claim is fraud in the inducement of the arbitration clause itself - an issue which goes to the 'making' of the agreement to arbitrate - the federal court may proceed to adjudicate it." 388 U.S. 395, 403–04 (1967). The Court then distinguished the difference between a claim of fraud specific to the arbitration agreement's terms and fraud generally to the contract. *See id*. "Under the *Prima Paint* standard, a federal court may only consider claims of fraud in the inducement 'if the fraud relates specifically to the arbitration clause itself and not to the contract generally.'" *Sydnor v. Conseco Fin. Servicing Corp.,* 252 F.3d 302, 307 (4th Cir. 2001) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991)).

As required under *Prima Paint,* Plaintiffs have raised a fraud claim that is specific to the entirety of the arbitration agreement. Plaintiffs have directly alleged that Advance Financial never intended to honor its arbitration agreement. That clause specifically states "You, related other parties, and we, waive the right to go to court." (Defs. Mem. Ex. A, at 5.) And yet Defendant repeatedly went to court.

Defendant agrees with the underlying legal standard, and acknowledges that "an arbitration . . . clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion[.]". (Defs.' Mem. 10.) Instead, Defendant's sole argument is a defense

on the merits of whether or not its arbitration clause was intended as represented. It suggests several possible explanations or defenses for its conduct.

First, Defendant argues that "Nothing in the Account Agreements required Advance Financial to arbitrate, in every instance, its breach of contract claims against Plaintiffs." (*Id*. at 11.) This is because it had the right to go to Small Claims Court. (*Id*.) And – according to Defendant – Small Claims Court was the same thing as General District Court. No, it is not. The contract of course is construed against Advance Financial, its drafter. *GMS Indus. Supply, Inc. v. G & S Supply, LLC*, 441 F. Supp. 3d 221, 229 (E.D. Va. 2020) (citing *Martin & Martin, Inc. v. Bradley Enters, Inc.*, 256 Va. 288, 291, 504 S.E.2d 849 (1998)). "Small Claims Court" in contracts between Virginia consumers and Defendant necessarily means "Small Claims Court." Defendant's claim otherwise defies the very idea of words having separate meanings. As detailed above, the Virginia Code clearly treats the Small Claims Court as a different court than General District Court, discussing them as such. For example, how could Small Claims Court have concurrent jurisdiction up to $5,000 with General District Court if the two courts were the same. And for consumers specifically, there is a huge difference between litigation against a fellow *pro se* party and a case brought by an attorney. And even if Small Claims Court were construed to be part of General District Court, debt collection actions brought against consumers by an attorney would be, by definition, not in that same part. Defendant's position is also not true. General District Court has jurisdiction up to $25,000. VA. CODE ANN. § 16.1-77(1). Advance Financial cannot readily claim that consumers could bring a wave of $25,000 lawsuits in General District Court and Defendant's faux arbitration clause's limitation to Small Claims Court would be inapplicable.

Defendant next argues that its faux clause was not fraudulent because consumers could have opted out or they could have filed a motion to compel arbitration when sued by Advance

Financial. (Defs.' Mem. 12.) But the entire basis for AAA and JAMS requiring mutual access only to Small Claims Court is because Small Claims Court is consumer – and *pro se* – friendly. Defendant's argument is that consumers always had the opportunity to file a motion challenging the General District Court's jurisdiction. The consumer could always brief and argue the issue. Maybe even appeal to Circuit Court. None of these steps would happen in Small Claims Court nor would they happen in arbitration. More importantly, the fact that a consumer could have thwarted (by somehow "opting out") or challenge (by filing a motion to compel arbitration when sued in General District Court) Defendant's fraud does not change the nature of the deceit. Advance Financial told consumers that neither party would be able to bring a lawsuit other than in Small Claims Court. It knew that was false when represented because at the same time it was making such misrepresentations, Defendant was also aggressively using the General District Courts to collect its loans.

Third, Defendant argues that its promise to arbitrate was not fraudulent when made because, "Parties to an arbitration clause may waive their right to an arbitration or otherwise agree not to arbitrate certain claims." (Defs.' Mem. 12.) As set out below, Plaintiffs agree that Advance Financial has waived its right to arbitration. But Defendant's express concession in its opposition to the fraudulent inducement claim that it has in fact waived arbitration still seems remarkable. What Defendant is really arguing is that its intent was not to misrepresent that consumers could not bring claims in court while it could; rather it intended to convey that consumers could not bring their claims in court, but Advance Financial could do so, as long as the debtor later waived their right to arbitrate.

Plaintiffs have no idea how this position rebuts the fairly clear evidence and implication that when Defendant induced Plaintiffs to enter into these contracts, it knew at that time that it did

not intend to abide by them. If – as Defendant now argues – what it really meant was that everyone was free to litigate in whatever forum they wanted unless opposed and argued in opposition at a later stage, that is not what the faux clause says.

Although Defendant's intent seems clear from the evidence, if a disputed issue of fact about this intent is raised, then Plaintiffs request this to proceed summarily to trial after appropriate discovery.

**B. Even if Advance Financial did not initially intend to ignore the arbitration restriction, the clause in operation was not mutual and was thus unenforceable.**

In order to be valid, a contract requires consideration. Consideration can be found when both parties agree to submit claims to arbitration. However, if a consumer agrees to give up the right to bring a claim in court, but the defendant does not do so or reserves the right to pursue certain claims or pursue certain remedies in court, such a contract lacks consideration, and therefore the arbitration clause is unenforceable. *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 609 (4th Cir. 2013) (noting under Maryland law, "an arbitration provision must be supported by consideration independent of the contract underlying it," and a clause that required homebuyers to submit "any and all disputes" with the seller to arbitration, but imposed no such requirements on the seller, bound only one party and failed for lack of mutuality); *Howard v. King's Crossing*, 264 F. App'x 345, 2008 WL 450460, at *2 (4th Cir. Feb. 19, 2008) ("In the sales agreement, Howard agreed to arbitrate her disputes against Defendants and to waive any right to proceed in a court of law. Defendants, on the other hand, made no corresponding promise. Rather, they reserved the right to seek specific performance of the agreement in any court . . . or to sue Howard for damages. Defendants' 'promise' is not merely illusory, it is nonexistent."); *Joudi v. Doerkin Properties, Inc.*, 46 F.3d 66 (5th Cir. 1995) (Ariz. law); *Hull v. Norcom, Inc.*, 750 F.2d 1547 (11th Cir. 1985) (N.Y. law).

Here, it is undisputed that Defendant remained unbound by the arbitration clause and in fact sued nearly or over 2,000 consumers – including the Plaintiffs – and collected money from over 500 of them, while consumers are barred from bringing any case outside Small Claims Court. Defendant's faux clause is not mutual in operation and is thus illusory and unenforceable.

### C. Defendant's contractual preservation of the ability to unilaterally change the terms of the arbitration clause makes it illusory and unenforceable.

Courts have found that a defendant's ability to unilaterally alter an arbitration agreement "at any time" and "for any reason" renders the arbitration clause illusory and unenforceable. *Howard,* 2008 WL 450460 (relying on Maryland law that retaining the right to modify an arbitration at will renders the promise to arbitrate illusory such that the arbitration agreement fails for lack of consideration). When a party reserves the right to alter any part of the arbitration agreement at will, it "render[s] its own agreement to submit to binding arbitration illusory." *McFarland v. Almond Bd. of Cal.,*, 2013 WL 1786418, at *8 (E.D. Cal. Apr. 25, 2013) (applying California law to find an illusory arbitration clause unenforceable). Otherwise, the drafting party can "modify the agreement on the fly, picking and choosing when the arbitration policy applies and when it does not." *Id.*

The illusory nature of Defendant's contract is even more problematic because Advance Financial embeds it in a contract of adhesion. Waivers in such contracts are properly treated with suspicion because of the absence of a true negotiating opportunity. *See Flint Hill Sch. v. McIntosh*, Record. No. 181678, 2020 WL 33258, at *7 (Va. S. Ct. Jan. 2, 2020) (unpublished) (finding that whether a contract is an adhesion contract is a factor to determining unconscionability). The United States Supreme Court highlighted this factor in *D.H. Overmyer Co. v. Frick Co*., 405 U.S. 174 (1972), regarding a company that waived by contract its due process right to a notice and a hearing to dispute a debt. The Court distinguished that case from those involving adhesion contracts:

Our holding, of course, is not controlling precedent for other facts of other cases. For example, where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the cognovit provision, other legal consequences may ensue.

*Id.* at 188.

The Fourth Circuit has recognized that when courts enforce unilateral modification clauses, they only do so when the clause is either procedurally or substantively limited. *See Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 93 n.5 (4th Cir. 2005) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 604 (3d Cir. 2002)) and *Pierce v. Kellogg Brown & Root*, 245 F.Supp.2d 1212, 1215–16 (E.D. Okla. 2003); *see also Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 478–79 (10th Cir. 2006). Without limitation, however, an "agreement allowing one party the unfettered right to alter the [ ] agreement's existence or its scope is illusory" and unenforceable." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, No. 1:16-CV-1613, 2017 WL 1479425, at *10 (E.D. Va. Apr. 21, 2017) (quoting *Dumais v. Am. Golf*, 299 F.3d 1216, 1219 (10th Cir. 2002)), *rev'd and remanded on other grounds,* 929 F.3d 135 (4th Cir. 2019). Virginia contract law does not enforce illusory promises. "Generally, 'where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has the right to hold the other to a positive agreement. Both parties must be bound, or neither is bound.'" *Capps v. Capps*, 216 Va. 378, 381, 219 S.E.2d 901, 903 (1975) (*citations omitted*).

Arbitration clauses are thus invalid if the defendant is free to modify any term of the contract, at any time, as such contract would not be supported by adequate consideration. *Noohi*, 708 F.3d at 606 (applying Maryland contract law); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999); *Day v. Fortune H-Tech Mktg., Inc.*, 536 F. App'x 600, 604 (6th Cir. 2013) (holding that "[b]ecause Defendant retained the ability to modify any term of the contract, at any time, its

promises were illusory" and therefore finding the entire contract, including the arbitration clause, void and unenforceable); *Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008) ("Only an illusory and unenforceable agreement to arbitrate resulted when distributors agreed to abide by dispute resolution procedures set forth in rules of conduct that seller of household products had reserved the right to unilaterally amend simply by publishing notice of amendment.")

In January 2020, Defendant emailed a notice to borrowers, attempting to unilaterally change the arbitration clause to permit Defendant to sue borrowers in Virginia General District Courts. (Defs.' Mem. 3; Ex. F, Advance Financial Email Notice Regarding Arbitration.) This notice claimed the purported change in arbitration terms would become effective without any action on the part of borrowers. (Ex. F, Advance Financial Email Notice Regarding Arbitration.). As shown by its attempt to unilaterally change the terms of the arbitration agreement, Advance Financial will modify the terms of the arbitration agreement at will. Thus, it has specifically demonstrated that the arbitration agreement is illusory and not supported by consideration. Therefore, under Virginia law, it and the delegation clause within are both unenforceable.

### D. If a valid agreement to arbitrate was formed, Defendant has waived their right to enforce the arbitration agreement.

Virginia law governing contracts provides that when a party acts inconsistently with a known contractual right, that party is said to have waived that right. *RMBS Recovery Holdings, I, LLC v. HSBC Bank USA, N.A.*, 297 Va. 327, 341, 827 S.E.2d 762, 769 (2019). "Waiver is an intentional relinquishment of a known right that consists of two elements: (1) knowledge of the facts basic to the exercise of the right and (2) the intent to relinquish that right." *Bates v. Purdon*, 101 Va. Cir. 104, 2019 WL 5965230 (Va. Cir. Ct. Jan. 25, 2019) (quoting *Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv.*, 267 Va. 642, 652, 595 S.E.2d 1, 6 (2004)). The owner of such a known right may waive it expressly or impliedly. *Id.* Under Virginia law,

> "a waiver occurs when a party intentionally gives up a contractual right that would have been beneficial to him. A waiver can be based on expressly stated words or it can be implied from conduct. However, a party must have full knowledge of the right before it can be waived."

*Cedar Glen, LLC v. White Oak Canyon, LLC*, 87 Va. Cir. 337, 2013 WL 9636583 (Va. Cir. Ct. Dec. 16, 2013)*; see also Bristol Metals, LLC v. Messer, LLC*, 2020 WL 6437471, *10 (E.D. Va. Nov. 2, 2020) (applying state contract law to breach of contract claim and finding waiver represents the intentional relinquishment of a known right) (quotations omitted).

The Fourth Circuit applies this principle of contracts to claims of waiver in the context of arbitration and requires that, in addition to action inconsistent with the right to arbitrate, a party asserting waiver must establish prejudice from that inconsistent action. One way a party can waive its right to arbitrate is to "substantially utilize the litigation machinery that to subsequently permit arbitration would prejudice the party opposing" arbitration. *MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 249 (4th Cir. 2001) (citation omitted). When a party seeking arbitration has invoked the "litigation machinery" to some degree, the question is whether the party opposing arbitration has suffered "actual prejudice." *Id.* (quoting *Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 817 F.2d 250, 252 (4th Cir. 1987). Under the FAA, a party may "forfeit its right to compel arbitration if it 'is in default in proceeding with such arbitration.'" *Barbagallo v. Niagara Credit Solutions, Inc.*, No. DKC 12–1885, 2012 WL 6478956, at *2 (D. Md., Dec. 4, 2012) (citing 9 U.S.C. § 3).

### 1.     Defendant's invocation of the litigation machinery constitutes waiver.

Invoking the "litigation machinery" is evidence of an implied waiver of the right to arbitrate, as it is conduct that is inconsistent with the known right to arbitrate. In debtor/creditor contexts, various courts have found that debt collection lawsuits can constitute, or contribute to a finding of, waiver of the arbitration requirement for subsequent consumer litigation. In *Barbagallo*, a district court applying Fourth Circuit law denied a motion to compel arbitration by a creditor,

finding the creditor's conduct in filing suit against the debtor in state court seeking collection of a debt that was the basis of the contract containing the arbitration clause contributed to a finding of waiver of the right to demand arbitration of debtor's subsequent unfair debt collection practices suit. 2012 WL6478956, *3–4; *see also Am. Gen. Fin. v. Griffin*, No. 99088, 2013 WL 3422900, at *7 (Ohio Ct. App. July 3, 2013) (lender's filing of suit on its arbitrable collection claims contributed to conclusion that lender waived arbitration of class counterclaims).

    In instances where a creditor fails to demand arbitration and, in the meantime, engages in pretrial activity inconsistent with an intent to arbitrate, the party later opposing a motion to compel arbitration may more easily show that its position has been compromised or prejudiced. *Fraser,* 817 F.2d at 252; *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 702 (4th Cir. 2012) (citing two factors of inquiry into actual prejudice: (1) the amount of the delay; and (2) the extent of the moving party's trial-oriented activity).

    Advance Financial's actions evidence its intent to waive arbitration in this case, as it "engage[d] in pretrial activity inconsistent with an intent to arbitrate" and the Plaintiffs' positions have been compromised, thus constituting prejudice. *Fraser*, 817 F.2d at 252 (quoting *Price v. Drexel Burham Lambert, Inc.,* 791 F.2d 1156, 1161 (5th Cir. 1986)). Indeed, the actions taken by Advance Financial in the General District Courts of Virginia in over 1,900 filings against the Plaintiffs constitute litigation of the same legal and factual issues as those it would seek to force into arbitration. Moreover, Advance Financial's mass litigation throughout Virginia establishes that it had every intention to use the courts of Virginia, and not invoke arbitration, in seeking judgments against the Plaintiffs. Accordingly, Advance Financial's invocation of the judicial machinery on such a large scale, even when under the original arbitration agreement, it was not

permitted to move for default judgment in Virginia General District courts, evidences its intention

to waive arbitration. *See Cornell & Co. v. Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966).

### 2. Prejudice resulted from Defendant's invocation of litigation machinery.

By prosecuting thousands of cases in the Virginia courts, Defendant sought and obtained

civil judgments, many by default, against Plaintiffs and the class they seek to represent.

Furthermore, it will attempt to use such default judgments against any assertion of claims by the

Plaintiffs in arbitration. Moreover, the entry of civil judgments against over 1,900 borrowers in

Virginia certainly prejudices those borrowers/unnamed plaintiffs, as the very heart of Plaintiffs'

claims is all, or at least a portion, of the debt is disputed based on the violations of federal and state

law.[7] (*See* Compl.)

> As to judgments rendered in state courts,
>
> the full faith and credit obligation is exacting. A final judgment in one State, if
> rendered by a court with adjudicatory authority over the subject matter and persons
> governed by the judgment, qualifies for recognition throughout the land. For claim
> and issue preclusion (res judicata) purposes, in other words, the judgment of the
> rendering State gains nationwide force.

*Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) (citations omitted). Thus,

Advance Financial gained a benefit through its mass litigation in Virginia courts by obtaining

default judgments in bulk, thereby prejudicing Plaintiffs, like Ms. Johnson, Mr. Ryan, and Mr.

---

[7] Defendant baldly states that its adhesion contract arbitration clause "is incredibly consumer friendly." (Defs.' Mem. 13.) Yet much of the arbitration terms are actually mandated by the JAMS's Consumer Arbitration Minimum Standards or AAA's Consumer Due Process Protocol, as noted in the introduction. (*See* Ex. B, JAMS Consumer Arbitration Minimum Standards (requiring the arbitration agreement to be reciprocally binding on all parties, consumer must have right to in-person hearing in hometown area, limiting amount consumer must pay to initiate arbitration and otherwise requiring company to pay fees); Ex. C, AAA Consumer Due Process Protocol (requiring hearings to be in a reasonably convenient location, preserving consumers right to go to small claims).)

Turpin (*See* Compl. ¶¶ 69, 93, and 117; Ex. I, Default Judgments Against Named Plaintiffs).[8] Its

mass litigation strategy certainly paid off well, as Advance Financial was even able to harvest

numerous default judgments at a single General District Court hearing time. (Ex. J, Online Docket

for 9/24/2019 Prince William Advance Financial Default Judgments.).[9] Not only could these

default judgments be used against these Plaintiffs during any arbitration, Plaintiffs are prejudiced

by the procedure Defendant invoked to take advantage of extremely quick procedure of General

District Courts whereby Advance Financial can go straight to judgment after one posting on "front

door of usual place of abode" of a Warrant in Debt and proof of "mailing." VA. CODE ANN. § 8.01-

296.

If Defendant had followed the agreed-upon arbitration process, Plaintiffs would have

received repeated mailings about that process prior to any enforceable judgment process even

being initiated. Under JAMS Streamlined Rules, Advance Financial would have first had to serve

a demand for arbitration on a consumer. (Ex. E, JAMS Streamlined Rules, at Rs. 5(b), 7). Then,

the consumer would have received a commencement letter that arbitration was proceeding. *(Id.* at

R. 5(b).) If the consumer failed to participate, she would have received a third written notice

informing her of such. (*Id.* at R. 5(c).) The consumer would then still receive notice of the

arbitration hearing. (*Id.* at R. 14(b).) Then the consumer would receive notice of the arbitrator's

final decision regarding the matter. (*Id.* at R. 19(h).)

---

[8] Plaintiffs request the Court to take judicial notice under Fed. R. Evid. 201(b)(2) of online dockets printouts and warrants in debt as the docket information is publicly available online and the case files are publicly available. *Welcome to the General District Court Online Case Information System*, General District Court Online Case Information System , https://eapps.courts.state.va.us/gdcourts/caseSearch.do (last visited Nov. 25, 2020).

[9] Plaintiffs request the Court to take judicial notice under Fed. R. Evid. 201(b)(2) of these online docket printouts as docket information is publicly available online. *Id.*

Similarly, under the American Arbitration Association's consumer rules, Advance Financial would have had to first provide written notice to a consumer of Advance Financial's arbitration demand. (Ex. D, AAA Consumer Arbitration Rules, R-2(a)(1).) The consumer would then receive a written notice from AAA that it has received the arbitration demand. (*Id.* at R-2(b).) The consumer may then receive written orders from the arbitrator regarding how the arbitration will be conducted. (*Id.* at R-21(c).) The consumer would then receive a written notice at least ten days prior to the arbitration hearing. (*Id.* at R-26.) And even if the consumer fails to appear at the hearing, Defendant would not be entitled to an arbitration award without first presenting adequate evidence. (*Id.* at R-39.) After the hearing, the consumer should then receive a written copy of the arbitration award. (*Id.* at R-46.)

Rather than follow this agreed process to resolve disputes, a process intended to provide consumers with multiple notices of the arbitration and an opportunity to participate and possibly resolve the debt, Advance Financial intentionally and methodically breached its arbitration agreements and went straight to the General District Courthouse in order to get a quick judgment in its favor. Thus, not only did Advance Financial have no intention to arbitrate its claims, as it acted inconsistent with any intention to arbitrate its dispute with any of the more than 1,900 consumers it filed suit against in Virginia courts, it also obtained judgments against some of the Plaintiffs and members of the class they seek to represent without the consumers even appearing to defend themselves. In those cases wherein members of the class did not appear in Virginia General District courts, it is unknown whether those consumers ever received actual notice of Advance Financial's lawsuit, like Mr. Ryan and Mr. Turpin who did not, (Comp. ¶ 94; Ex. K, Declarations of Sued Advanced Financial Consumers, at 7-8, 10-11,) or if such consumers were like Ms. Johnson and were unable to attend court. (Compl. ¶ 68; Ex. K, Declarations of Sued

Advance Financial Consumers, at 17-18.) Given the often-voluminous dockets that Virginia General District Courts handle, Advance Financial has been able to effectively turn these courts into default judgment mills, in blatant violation of the arbitration agreement that Advance Financial entered into with consumers. Consumers were thus prejudiced by not being afforded an opportunity to have these disputes heard by a less rushed forum, such as American Arbitration Association or JAMS.

Other consumers were prejudiced in the same way that Mr. Selig, Mr. Miller, Ms. Richardson, Mr. Reel, and Ms. Bauer-Robertson were prejudiced, all who were forced to seek counsel and defend themselves in a court action that never should have been initiated. (Compl. ¶ 98; Ex. K, Declarations of Sued Advance Financial Consumers, at 2, 4, 6, 14, 16.) Consumers also faced prejudice in the stress and inconvenience caused by a lawsuit being filed against them. (Ex. K, Declarations of Sued Advance Financial Consumers, at 2, 16).

Consumers were also prejudiced through Advance Financial's mass filing of warrant in debts as it made what were intended to be private disputes into a matter of public record. Courts have found that despite parties' agreement to proceed in private mediation, once such dispute proceeds to court, the parties lose any bargained-for confidentiality regarding the dispute. *Lucy Chi v. Univ. S. Cal.*, No. 2:18-cv-04258-SVW-GJS, 2019 WL 3315282, at *2 (C.D. Cal. May 21, 2019) (finding that there is no longer confidentiality of documents provided in mediation once such documents become part of a court record). Here, Advance Financial unmistakably agreed to arbitrate disputes with consumers. Further, both designated arbitration forums, JAMS and AAA, emphasize the importance of confidentiality of their proceedings. (Ex. E, JAMS Streamlined Arbitration Rules, R. 21; Ex. C, AAA Consumer Due Process Protocol 27.) Neither forum provides a publicly searchable database of rulings along with party information, in stark contrast to the

Virginia General District Court System. *See Welcome to the General District Court Online Case Information System*, General District Court Online Case Information System, https://eapps.courts.state.va.us/gdcourts/caseSearch.do?welcomePage=welcomePage (last visited Nov. 25, 2020).

Consumers have a strong interest in confidentiality when they have been accused of not paying a debt. (Ex. K, Declarations of Sued Advance Financial Consumers, at 2, 4, 6, 8, 11, 14, 16, 18.) Indeed, when such disputes become civil judgments and a matter of public record, this can severely damage a consumer's livelihood by impeding their access to credit, housing, and employment. *See* Nina Agrawal, *Your Credit Scores Might Suddenly Rise This Summer. Here's Why*, Los Angeles Times (Mar. 14, 2017, 1:30 PM), https://www.latimes.com/business/la-fi-credit-report-20170314-story.html (noting that a public record such as a civil judgment can cause a drop in a consumer's credit score by 150 points); *What is Payment History?*, MyFICO, https://www.myfico.com/credit-education/credit-scores/payment-history (last visited Nov. 25, 2020) (noting that lawsuits on one's credit report "are quite serious" in terms of calculating FICO score). Further, any reasonable person would not want their bank account and routing number to become a matter of public record. (Ex. K, Declarations of Sued Advance Financial Consumers, at 8, 11, 14.) Yet, Advance Financial completely disregarded this material term of confidentiality in resolving disputes and instead filed nearly 2000 lawsuits in courts across Virginia, causing reputational damage to consumers by publicizing what was supposed to be a private dispute and then publishing sensitive financial account information about these consumers.

Consequently, because Advance Financial both substantially invoked judicial machinery and prejudiced the Plaintiffs and the class they seek to represent, Advance Financial waived its rights to enforce the arbitration clause.

### III.    CLASS ACTION WAIVER

Within the arbitration clause it drafted, Advance Financial included a provision which seeks to waive consumers' rights to participate in class actions. (Defs.' Mem. at 3.) However, this provision is an inextricable component of the overall arbitration clause and must be stricken along with the rest of the arbitration clause. *See MacDonald v. Cashcall, Inc.*, No. CV 16-2781, 2019 WL 5617511, at *15 (D.N.J. Oct. 31, 2019) (refusing to enforce a class waiver because it was "an integral part of an arbitration agreement" which was unenforceable). Here, the class action waiver clause is within a table with the heading "JURY TRIAL WAIVER AND ARBITRATION CLAUSE." (Defs.' Mem., Ex. A, at 5.) The first two rows of this table explicitly address arbitration and arbiters. (*Id.*) Even in the row concerning class action waiver, the clause refers back to arbitration. (*Id.*). The waiver then states "Unless reversed on appeal if a court invalidates this waiver the Clause will be void." (*Id.*) The class action waiver is thus an integral part of the arbitration agreement and should thus be rendered unenforceable along with the rest of the arbitration agreement.

Under Virginia law a court is not to blue pencil an arbitration clause to make the clause enforceable.

> Virginia courts have also recognized the difference between severing a clause or provision of a contract, and rewriting or 'blue penciling' a contract in order to make it enforceable. Although Virginia courts will look to the intent of the parties to determine severability of clauses or provisions, they will not "blue pencil" a contract to make it enforceable. Therefore, it is critical to determine whether the Arbitration Agreement at issue is subject to severability or blue penciling.
>
> The difference between 'blue penciling' and severing is a matter of focus. The former emphasizes deleting, and in some jurisdictions adding words in a particular clause. The latter emphasizes construing independent clauses independently.

*Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F.Supp.2d 958, 965-66 (W.D. Va. 2000) (citations omitted); *see Cliff Simmons Roofing, Inc. v. Cash,* 1999 WL 370247, *1-2 (Va. Cir. Ct.

June 4, 1999) (refusing to edit contract by selectively enforcing only those portions permissible by law); *Pais v. Automation Products, Inc.,* 36 Va. Cir. 230 (1995) ("[T]his court has not been granted the authority to 'blue pencil' or otherwise rewrite the contract, the covenants therefore fail").

    *Pitchford* was cited and relied upon by Judge Lee in *Browne v. Kline Tysons Imports, Inc.*, 190 F. Supp. 2d 827, 831-32 (E.D. Va. 2002), in which that defendant asked the Court to delete "binding" from the clause "binding arbitration." The court declined, explaining:

> The Buyer's Order is the only contract that refers to arbitration and it only states "binding arbitration." Kline does not seek to eliminate a clause, it seeks to delete a word within the clause: "binding." The Court finds this to be an impermissible attempt to rewrite the contract at issue. Kline should not be permitted to repudiate the obligation of the clause (the binding nature) yet seek a remedy arising from that same clause (the arbitration itself). Therefore, the Court declines to rewrite the Buyer's Order and mandate non-binding arbitration. The Buyer's Order provides for binding arbitration, Kline's claims under the MMWA are not subject to binding arbitration, therefore, it is beyond this Court's authority to stay such claims.

*Id*. Additionally, courts are reluctant to redraft an arbitration clause to make it enforceable because of the risk of rewarding the party who drafted the impermissible clause. *Cooper v. MRM Inv, Co.*, 367 F.3d 493, 512-13 (6th Cir. 2004) (affirming plaintiff's argument that a defendant seeking arbitration "will not be deterred from routinely inserting such a deliberately illegal clause into the arbitration agreement it mandates for its employees if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter").

    When arbitration agreements are used in an attempt to overreach, no reason exists to save them. *See Nino v. Jewelry Exch. Inc*., 609 F.3d 191, 208 (3rd Cir. 2010) ("We conclude, in sum, that the arbitration agreement is procedurally and substantively unconscionable, and that the pervasively one-sided nature of the agreement forecloses any possibility of severing the unfair provisions from the remainder of the agreement."); *Graham Oil v. Arco Prods. Co.*, 43 F.3d 1244, 1248-49 (9th Cir. 1994) ("ARCO attempted to use an arbitration clause to achieve its unlawful ends. Such a blatant misuse of the arbitration procedure serves to taint the entire clause."). As a

leading treatise notes, severance is inappropriate when the entire clause represents an "integrated scheme to contravene public policy." *See* E. Allan Farnsworth, *Farnsworth on Contracts* § 5.8, at 70 (1990) (cited in *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1058 (11th Cir. 1998). "This is so because the presence of an unlawful provision in an arbitration agreement may serve to taint the entire arbitration agreement, rendering the agreement completely unenforceable, not just subject to judicial reformation." *Paladino,* 134 F.3d at 1058 (citing *Graham,* 43 F.3d at 1248-49, and *Stirlen v. Supercuts, Inc.*, 60 Cal. Rptr. 2d 138 (Cal. Ct. App. 1997)).

Consistent with these principles, the Fourth Circuit refuses to redraft impermissible arbitration agreements to make them enforceable. In *Hayes v. Delbert Servs. Corp*., the Fourth Circuit stated "[i]t is a basic principle of contract law that an unenforceable provision cannot be severed when it goes [to] the 'essence' of the contract." 811 F.3d at 675–76 (quoting 8 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 19:73 (4th ed. 1993)). Further, the Court explained that "severance should not be used when an agreement represents an 'integrated scheme to contravene public policy.'" *Hayes*, at 676. One year later, the Fourth Circuit reaffirmed this holding:

> In essence, BMO Harris seeks to rewrite the unenforceable foreign choice of law provision in order to save the remainder of the arbitration agreement. As we discussed in *Hayes*, such a result is untenable. Unlawful portions of a contract may be severed only if: (1) the unlawful provision is not central or essential to the parties' agreement; and (2) the party seeking to enforce the remainder negotiated the agreement in good faith.

*Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336-37 (4th Cir. 2017) (citing 8 Williston on Contracts § 19:70 (4th ed. 1993 & Supp. 2010); Restatement (Second) of Contracts § 184 (1981)). Specifically, *Dillon* noted that "when a party uses its superior bargaining power to extract a promise that offends public policy, courts generally opt not to redraft an agreement to enforce

another promise in that contract." *Id.* at 337; *see also Hengle*, F. Supp. 3d. at 856. *In Hengle*, this Court noted "triple-digit, high-interest payday loans" that the defendants offered was clear evidence of their superior bargaining power over plaintiffs in that case. *Hengle*, F. Supp. 3d. at 856. This Court then refused to sever the offending provisions of that arbitration clause, noting that the defendants there had ignored the requirement of good faith by crafting an arbitration agreement that sought to deprive consumers of their statutory rights. *Id.*

Similar to the *Hengle* defendants, Defendant here also offers credit with triple-digit interest rates, thus showing Defendant's superior bargaining power in entering into credit contracts with consumers. Just as the *Hengle* defendants contrived an agreement to rob consumers of their statutory rights, here, Defendant has schemed to fraudulently induce consumers into an illusory arbitration agreement which in effect bars consumers from litigating their claims against Defendant while Defendant repeatedly reaps civil judgments against them in Virginia courts. Accordingly, this Court should follow the precedent set in *Hayes* and *Dillon*, and find that the entire arbitration clause is unenforceable and not rewrite it to benefit Advance Financial. If the Court were to try to blue-pencil this agreement to make it properly enforceable, it would need to rework many provisions and fundamentally change what Advance Financial drafted, which would contravene the aforementioned body of law on blue-penciling.

Therefore, the class action waiver rises or falls with the arbitration clause in which it is embedded.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request this Court to deny Defendant's Motion to Compel Arbitration and find Defendant's class action waiver unenforceable. In the alternative, if the Court finds any fact in dispute regarding the enforceability of the arbitration clause, Plaintiffs respectfully request a hearing preceded by an appropriate discovery period.

Respectfully Submitted,

PLAINTIFFS


By:      /s/ Kevin Dillon
Leonard A. Bennett, VSB #37523
Thomas D. Domonoske, VSB # 35434
Kevin A. Dillon, VSB # 93475
Craig C. Marchiando, VSB # 89736
Amy Austin, VSB # 46579
CONSUMER LITIGATION ASSOCIATES, PC
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: tom@clalegal.com
Email: kevin@clalegal.com
Email: craig@clalegal.com
Email: amyaustin@clalegal.com

Kristi C. Kelly, VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyguzzo.com


Dale W. Pittman, VSB #15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Telephone: 804-861-6000
Fax: 804-861-3368
Email: dale@pittmanlawoffice.com


Michael C. Litman, VSB #92364
LITMAN PLLC
6802 Paragon Place, Suite 410
Richmond, VA 23230
Telephone: 804-723-6912

Email: mike@mlitman.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of November, 2020, I caused the foregoing to be filed with the Clerk of the Court using CM/ECF, which will send a notification of such filing (NEF) to the following counsel of record:

Brendan O'Toole
Virginia State Bar No. 71329
Counsel for Defendants
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6588
Facsimile: (804) 420-6507
botoole@williamsmullen.com

Meredith M. Haynes
Virginia State Bar No. 80163
Counsel for Defendants
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6225
Facsimile: (804) 420-6507
mhaynes@williamsmullen.com

Amanda H. Bird
Virginia State Bar No. 92110
Counsel for Defendants
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6346
Facsimile: (804) 420-6507
abird@williamsmullen.com

*Counsel for Defendants Shiva Finance, LLC and Harpeth Financial Services, LLC*

By:____*/s/ Kevin Dillon*_____
Kevin Dillon, VSB #93475
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601